25-1019. I will note we do have 10 minutes per side for each of the motions that are being argued. We'll largely keep to the time constraints. Obviously, there are a number of issues that have been briefed. To the extent my colleagues or I have questions keeping us beyond that time, I'll make sure that it's evenly distributed fair to both sides for opportunities to be heard. But do keep in mind the time constraints and keep your eyes on the clock, please. So we will begin. Mr. Anson, when you're ready. May it please the Court, Drew Ensign, Deputy Assistant Attorney General for the United States. This appeal arises from the District Court exercising jurisdiction in the teeth of multiple independent jurisdictional bars. The result is precisely what Congress took particular care to avoid. Simultaneous proceedings in both Immigration Courts and District Courts considering the same issues regarding removals of aliens from the United States. This Court should say the injunction below or issue a writ of mandamus to dissolve the order. Let me just start with that opening. To the extent that the contention here is that it's a challenge to detention and not to removal, is the argument that because there is substantive overlap between the claims that will be heard in respect to the detention challenges versus the removal challenges through the petition for review process, that Congress has eliminated habeas jurisdiction with respect to any of that sort of substantive overlap? In the main, yes, Your Honor. Because the detention here is detention pending removal, it is inextricably bound up with the decision to initiate removal proceedings. And so the challenges that they're raising apply equally to the decision to initiate the removal proceedings and to have that detention pending removal. Both the 11th Circuit and the 3rd Circuit have not recognized as much. The 11th Circuit in the Alvarez case would explain that, quote, securing an alien while awaiting his removal hearing constitutes an action taken to commence proceedings, end quote. And the 3rd Circuit... In Alvarez, the 11th Circuit case, I think there was a removal order. Is that correct? Your Honor, I'm not recalling offhand, but it was a challenge to the detention pending removal. So that might have arisen from a final order of removal under the B-9 Zipper Clause. But it certainly was a challenge considering that detention, and it held that that was bound up in the B-9 and A-5 jurisdictional bars. But doesn't that potentially make a significant difference, that there had been proceedings and there was an order of removal, as opposed to here, there was none of that? I agree that it makes a difference, but I think it's precisely what Congress was trying to avoid for subsections A-5 and B-9. Through the Zipper Clause, it's specifically trying to... But is that a sort of purposive argument? Congress was trying to do something, or do we look to the text of the relevant provisions for a clear statement of jurisdiction stripping with respect to the particular claim and challenge that's being brought? Your Honor, certainly we're happy to proceed by the plain text, which makes very clear what it is. And certainly the cases applying it make it very clear exactly what it is. And I think there's actually multiple jurisdictional bars here, so I think it might be helpful to go through each of them. Sure. Just as an example for the distinction with Alvarez, potentially the 11th Circuit case, subsection B starts by saying, with respect to orders of removal, the following restrictions apply. So I can see why the Alvarez Court would head down to B-9 from B, because textually it applies. We don't have an order of removal here, so I'm not sure how we get down to the subcategories. Certainly, Your Honor. So B-9, for example, says judicial review of all questions of law and fact, including interpretation and application and constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States, and that eliminates jurisdiction. Right, that's B-9. But B says, with respect to review of an order of removal under subsection A-1, the following requirements apply. So I see how you get there in Alvarez, there was an order of removal. How do you get down to B-9 as a preliminary matter, and then we should talk about the language of B-9. But how do you get there textually in light of that language? Because B-9 says that all issues arising from removal proceedings, and this is an issue arising from removal proceedings. This is detention pending removal, and it is a challenge to detention pending that removal, and hence it arises from those proceedings. Suppose the detainee's claim was, well, he just simply got the wrong person. I'm not Ms. Oster, I'm someone else. And the government says, forget it, we didn't make a mistake, you lost. How was she to challenge that without having to wait months and months in removal proceedings and then come to court of appeals? Your Honor, to the extent that it's a challenge that an initial assistant is charged and  Sorry? To the extent that that would be a challenge to the initial decision to initiate removal proceedings and detain pending them, that would have to be raised in the immigration court. And I think that could, you know, the mistaken identity one could probably be raised and adjudicated rather quickly. There are instances that fall outside of the bar. I believe this court in the Velasco Gomez case recognized the challenge to ongoing detention and bail pending that was not bound up in the initial decision to seek removal and the decision to have detention pending removal. And so in that case, that could fall outside the bar. But to the extent that something is challenging that initial decision to bring initiate removal proceedings and detain pending those removal proceedings, that is squarely bound up in both the 1252G bar and the 8559. Before you proceed further through the list of all the possible bars in the arguments that you've made and briefed, I had a question about your argument that the petition for habeas relief is deficient, not only because it was filed in Massachusetts and then transferred Vermont, but because it didn't correctly name her custodian when it was filed. You know, it's been reported and you've acknowledged that it was, that Ms. Ostrick was transported from Somerville through New Hampshire to Vermont and was only 24 hours later when she arrived in Louisiana that she was settled someplace. And it's not been clear to me who the custodian was that you say should have been named as opposed to Ms. Hyde, who was the field director for New England. Why wasn't that sufficient in these circumstances where her whereabouts were unknown to support her habeas petition? Why is that a fatal flaw? Your Honor, to be clear, it's one of the many flaws. But I think to do that, you're right. I think that exception applies where something is unknown for a period of time. Do you know now who was the custodian when her habeas petition was filed? Your Honor, as to when the amended petition was filed... Well, first question, as to when the petition was filed, is it known to you who the custodian was? I don't specifically have that knowledge, but the government would. What is that? With respect to that, it would be... Isn't that always true with an unknown custodian, that the custodian knows that they're the custodian? On March 25th, who was the custodian? Your Honor, I apologize. I don't specifically know the name. It would be the warden of the Vermont facility that would be exercising control over her. She was in the facility when the petition was filed, or she was in transit? I had understood that. I thought I had understood, but please correct me if I'm wrong, that she was in transit from New Hampshire to Vermont at the time. She was in Vermont to transfer to a Vermont facility, and the custodian of the ultimate destination would be the custodian for purposes of... Well, if you're... So she wasn't in... If I finish at the... Would have been who? Finish that sentence, please. Would have been the warden of the ultimate facility being transferred to. Louisiana? No, as to the original petition. As to the amended petition, the amended petition was filed when she was in Louisiana, so that would be... Right, but Rule 15 tells us you relate back, and ex parte endo tells us that even if someone's transferred out of jurisdiction, once there is jurisdiction, that that doesn't eliminate the original court's jurisdiction. So, your Honor, I think a couple of responses to that. At first, we think even the original petition doesn't fall within the ex parte endo exception, and then more clearly, the amended one does not. So let me just walk through that. So the original one, the endo exception applies specifically where the original court had acquired jurisdiction, end quote. It also applies when the petition was, quote, properly filed... Or when the petitioner, quote, properly files a petition naming her immediate custodian, end quote. So because the District of Vermont never validly acquired jurisdiction, it can't... The endo exception doesn't apply. Endo is limited to where court validly acquires jurisdiction in the first instance, and then the government cannot defeat that jurisdiction by transferring someone out of the district. Is that arguing that the 1631 transfer was somehow improper from the Massachusetts court to the Vermont court? It is, Your Honor, because 1631... Wouldn't that have been appealed when the Massachusetts court issued its transfer order and challenged in that regard? I think... Tell me if I'm wrong. The government didn't appeal that. The government did not appeal it, but what the government's argument is is the Vermont court lacks habeas jurisdiction, and 1631 cannot create habeas jurisdiction where Congress has not provided it. And so if all... Right, but that provision says if it's proper, it can move... It becomes proper as if it filed in the transfer or court. Well, but in order for it to be proper, the Vermont court would have to have habeas jurisdiction as a matter of substantive authority. And because it doesn't fall within the ex parte endo exception, the Vermont court never had habeas authority, and hence a transfer to it was inappropriate. And all of that applies to the original petition, but it applies even more clearly to the amended petition. As the Supreme Court has made clear in the Royal O'Kanan case, an amended complaint completely supersedes the original. The amended complaint was filed in the District of Massachusetts at a time where... That case I think that you cite, correct me if I'm wrong, is about subject matter jurisdiction, and we know from Padilla that this is not about subject matter jurisdiction. That's correct. It's not about subject matter jurisdiction. And so that brings back to the Rule 15 question, if you could incorporate that relation back under Rule 15. Your Honor, while it may not be subject matter jurisdiction, it ultimately goes to the habeas authority of the court, which Padilla makes clear is very carefully circumscribed. And so you can't... Where the amended petition is the only one before you, that very clearly habeas jurisdiction did not exist in the District of Vermont when that amended petition was transferred. It clearly existed in the Western District of Louisiana. It existed neither in Massachusetts nor Vermont. And hence, that transfer... It didn't exist in Louisiana at the time the petition was filed, right? It did not... When the original petition was filed, it could have been filed in the District of Vermont, and then that court would have validly acquired jurisdiction. Because it was not, it never acquired jurisdiction. And why was it not? Bad faith on gamesmanship on the part of petitioner? Why wasn't it filed in Vermont? Your Honor, things were moving quickly. The government does not necessarily provide real-time GPS data of every single person within its custody, and there are operational security concerns about providing such real-time payment. There was no intent... But I thought you answered earlier that it could have been, it should be the custodian of the institution where she was going to end up. And so there wouldn't have been any security concerns in providing response to counsel as to where she is, that she will be in custody in the District of Vermont, would it? Your Honor, DHS believes there are security, there are operational security concerns about revealing details about ongoing transfers. And that's not just DHS. The Bureau of Prisons has a similar policy. But Ms. Osterk had been seized in Somerville on the streets by unmarked, placed in an unmarked vehicle and seized by people who are not in uniform and who were masked and hooded. And to all outward appearances, they could have been private actors. And that was, you know, she was not entitled, she was not allowed to contact anyone for 24 hours thereafter. She'd been a citizen. She'd been someone else or there'd been a mistake, as Judge Parker pointed out. You're saying she has no remedy until the government decides to make her whereabouts known, and there's no limit on the time the government can take for that to occur. I'm having difficulty understanding why Judge Nathan's line of questioning about she was on the street in Massachusetts, she disappeared from Massachusetts, and the habeas petition was filed in Massachusetts, and to direct to the location that was the location where she was found 24 hours later. Why isn't that, doesn't it give you pause about your arguments about the technicalities of the naming of the custodian, for example? Your Honor, the time period that we're talking about here is less than 24 hours, and I'm It was 12 hours, I guess. It was from 5 p.m. at her when she was seized to 4 a.m. when she was put on the plane. That's my understanding, Your Honor. Okay, sorry. I overstated that, sorry. No apologies necessary, Your Honor. We're talking about a very short period of time here. There may be longer periods of time that would present that unknown custodian exception, but we're nowhere near that here. And, you know, that's something I'm not aware of a single case holding it for such a brief period of time. But you're saying we know now who the custodian is because you're saying that it should have been the warden of the facility in Vermont? Well, Your Honor, to begin with... I do want to just go back to that question. Who was the custodian at the time the petition was filed? Your Honor, I think it would be the custodian of the destination in Vermont, but... Was she there when the petition was filed? I believe she was in transit, but that was... So who was the custodian then? I believe it would be the destination because that's where she was being transferred to, and that was essentially the next stop. I see. So is there any authority for that? Was she in transit? Was she in Massachusetts or Vermont at the time? Your Honor, she was in Vermont. How do you know? How do you know? She was in transit, I thought you said. How do you know where she was? What's that? Your Honor, I believe that's in the record, but I also think it's more important to focus on the amended petition here because there are no doubts. Oh, I'll get to that in a minute. Let's focus on my question. Your Honor, I don't believe it's a disputed fact that she was physically present in the state of Vermont when the petition was filed. In transit. That's what I thought was undisputed. That's my understanding as well. And then you're saying that Patricia Hyde, who's the field director for New England for ICE, couldn't be considered the custodian while she was in transit. Is that right? I'm sorry, Your Honor. Patricia Hyde, I believe who was named in the petition, was the field director for New England for ICE, right? I believe that's correct, Your Honor. And so if she was in transit, why is Ms. Hyde not the correct respondent? Your Honor, because she was headed to the facility, the PDA recognizes the immediate custodian role. And so under those circumstances, and I grant you these are very unique facts, that the immediate custodian would be the effective warden of the facility where she was headed to would be the ordinary application. Even though she wasn't there yet. Even though she wasn't there yet, but she was being transferred to there. That person could have ordered her to be brought to court in the moment the habeas petition is filed, just as a theoretical matter? Your Honor, it's kind of a strange theoretical question because by the time the court did anything, of course, she would be there and within the facility. So I think that's the most obvious person that would have authority because by the time the court actually acted, that is the person that would be responding to whatever habeas related order that a court might issue. But it seems to me that's an ex parte endo problem because each time somebody's transferred, you could say, well, that then is the person who would bring them to court and therefore the original jurisdiction is gone and the jurisdiction is where they're detained now. Your Honor, the Kennedy concurrence of the PDA case acknowledges that possibility of an exception where there would be extreme facts and essentially the government keeps moving the person and keeps moving them so quickly that the habeas petitioner is never able to catch up. Nothing like that. I'm not trying to posit extreme facts. I was trying to focus on the facts here where you're suggesting that not the person who has custody at the time the petition is filed, but the person who has custody at some later point at which they could. I understand you're saying the principle is who could then bring them to court in the event that the writ ran. That's the person who should be named properly as the custodian. That just seems to me to run headlong into ex parte endo. Your Honor, I don't believe so. I think that's the best application of the PDA immediate custodian rule. But I also think that that's ultimately unnecessary to get into here because there is simply no circumstance, particularly under the amended petition, but even under the original one where the ex parte endo exception applies. You would have to have someone in the District of Vermont, you would have to have the District of Vermont validly acquire jurisdiction and then a transfer out after that acquisition of jurisdiction for the endo exception to apply. That absolutely has not happened here and hence endo, you know, the endo exception. I mean it did if, we're around in a circle, but it did if the transfer was appropriate and I understand the government's arguments. Could I just ask as a preliminary matter about appellate jurisdiction? Yes, Your Honor. You argue, I can't tell if you argue both collateral order and that it's effectively a PI. What is the government's position? It is both, Your Honor. It is effectively an injunction. It requires the government to take certain steps. Can I ask on that if the order to transfer had been denied, would the government concede appellate jurisdiction? Your Honor, I can't say definitively. I mean if it's a PI, denial of a PI is interlocutorily appealable. That's ordinarily the correct rule and I suspect that would apply here. There are some odd, there's been a lot of action about the appealability of TROs recently and it does seem to be somewhat asymmetric in that the granting of TROs tends to be more like an appealable PI than a denial one. But here, I don't, I hadn't seen that distinction in the cases, but do you have a case in mind that rests on that? You're saying the body of cases appellate courts take jurisdiction when it's a granting of a PI but not denying a PI? I don't know why statutorily that would be the case. It's the nature of a TRO that the grant of it is more likely to look like an injunction and hence be an appealable order. And so the Supreme Court's recent decision in the Department of Education versus California is maybe a good example of that where you might suspect that if that had been a TRO denial that that would not have been appealable but as a grant. It was held to be within the appellate jurisdiction of the courts of appeals. Nonetheless. And for collateral order, I guess same question. If the denial of a transportation order, a transfer order, would the government think it collaterally appealable? Your Honor, I suspect so. I mean, the same three factors that govern the collateral order doctrine would seem like why. Now, there could, of course, be factual variations, but if it conclusively resolved the transfer question and was effectively unreviewable and was distinct from the merits, it certainly would seem to fit. Here, however, with a grant of a transfer order, and we know from the Supreme Court's decision in Chute v. Twyford that that absolutely falls within the collateral order doctrine and is appealable. And indeed, they thought that was so obvious that they relegated that discussion to a footnote. All right. Thank you, Mr. Ensign. And you'll obviously have time in the next motion as well to hit any overlapping matters that you'd like to spend time on. Thank you, Your Honor. Thank you. We'll hear from Ms. Bondari. May it please the Court. Aisha Bondari from the American Civil Liberties Union for the petitioner appellate. Romesa Ostrom's case is unprecedented and shocking. She has been held behind bars for six weeks while her health deteriorates for writing an op-ed. And now that the district court is on the verge of hearing her urgent claim for release this Friday, the government asks this court to extraordinarily intervene to block her transfer to the district as if it is the party suffering any irreparable harm. But neither the law nor the equities favor the government here, and this court should enable Ms. Ostrom's immediate transfer to the district to enable a full and fair adjudication of her hideous claims. First, this court should find that there is no appellate jurisdiction here, because this transfer order is simply an exercise of the district court's inherent and statutory authority to hear the hideous petition that is properly before it. Why isn't it on all fours with Shoup other than that it's a question of state sovereignty there, and I suppose your opponent on the other side would say a question of executive sovereignty here. Certainly. Shoup is a very different context, and Shoup was much more in line with other cases that have found that collateral order doctrine applies. In Shoup, in a footnote, the Supreme Court assumed that it had appellate jurisdiction in a context of a case that was about EDCA, and whether you could even attack the finality of a state final conviction. So it was much more akin to a question of state immunity from Shoup, and all of the cases that have found collateral order doctrine have involved immunities. Damages cases where there's an entitlement not to have to present yourself in court to respond to that process. I mean, it's parallel to the argument the government's making here, that Congress, the jurisdictional stripping arguments, that Congress has stripped the courts of jurisdiction to hear these claims. It's not exactly immunity, but it runs parallel in rationale. It is not the same. Obviously, we disagree that Congress has stripped jurisdiction to hear these claims, but even so, those are questions of subject matter jurisdiction, and the Supreme Court has said subject matter jurisdiction decisions do not automatically trigger collateral order review. It really is damages claims like 11th Amendment immunity from Shoup or qualified immunity where the harm is effectuated simply by having to go through the suit. Now, a decision on subject matter jurisdiction does not trigger that collateral order review because it just means that the federal government, like any other litigant, has to bear the normal costs of litigation, which include things like discovery orders, which may compel the presence of witnesses in court to testify. It may compel the presence of people in government custody to appear before the court. It may compel them to give depositions, to produce discovery. All of these are the ordinary course of litigation, and Shoup— But still, where the government is claiming that the transfer order itself is violative of its prerogatives and of numerous statutory provisions in terms of the district court's exercise of jurisdiction, that's essentially unreviewable after the transfer happens, isn't it? With respect, no, it is not essentially unreviewable. All of the cases— Well, it can't be repaired. It can't be reversed. It's done, right? Certainly it is done for the period of time in which the district court is adjudicating the cases, but that is not the type of irreparable harm that the courts are concerned about when they permit interlocutory review. So, for example, in the Department of Education case that the government mentioned, you had a situation where once funds were dispersed, funds that were themselves at issue in the case, the government kept the funds or the party seeking the funds. Once those were dispersed, they could never be returned. Here, there's no ultimate relief where Ms. Ostrick is seeking to be detained in a particular location or to interfere with the government's prerogative to hold her in a location if it has lawful authority to hold her. What the transfer order does is says she has raised a claim of unlawful detention. Obviously, the government has no discretion to detain someone unlawfully, and it follows that the government doesn't have any discretion to detain her unlawfully in a location of its choice. But to adjudicate that claim, the district court has said, I require the presence of Ms. Ostrick in the district. I require her presence in court where she will be prepared to testify. I require her presence in her counsel. This is the kind of cost, operational cost, on the government that litigants and the government bear every day. And again, I know other discovery orders where the government might have to produce someone in ICE detention for testimony or for deposition. They might have to bear costs of producing documents. And in your view, it makes no difference that these transfer questions are bound up in the jurisdictional reach of the court, which your counsel on the other side vehemently disputes? Well, I think if you did consider this to be a question of judicial review of the discretion, which again, this is not that, because the ultimate relief that the parties are disputing is not where she can be detained, and there's no discretion to hold someone unlawfully. But even then, I think the jurisdiction stripping provisions of the INA don't apply to the decision regarding transfer or location. And I think the Fourth Circuit in Reyna and the First Circuit in Aguilar have the correct approach there in finding that that's not a discretionary decision that is explicitly set out in the statute in the way that the Supreme Court in Kukana said is required for it to be essentially unreviewable. Can I—I hear you making an argument that I don't think I fully appreciated from the papers, but that essentially the irreparable—you understand the irreparable harm arguments to be—to sort of happen first at the appellate jurisdiction stage. That is to say, only—that under the collateral order doctrine, at least, there's only appellate jurisdiction in the case of some kind of irreparable harm. I can't see that—say that's a formulation that I have in mind as to collateral order, and I don't see it as what the Court's doing in Shoup, at least. That is one of our arguments, and I do know in Shoup that the transfer order was not considered an injunction. So to respond to the government's argument about that, it only looked at it as a collateral order. But really, in Shoup and in Cohen and other cases looking at collateral order doctrine, they really looked at whether there's an issue unrelated to the merits that, you know, simply cannot be addressed after the fact. Now, first of all, this is an order that is intimately related to the merits, because it goes to a district court's inherent authority to conduct a full and fair adjudication. So that is why it was also similar to discovery orders, because the district court wants to adjudicate the Habeas Petition expeditiously. It is holding a hearing on Friday. It requires a response to its presence in court. And so those, you know, the district court has repeatedly said, we don't expand collateral order doctrine lightly. It's always kept them very tight in the cabin. And so the government's argument, I think, proves too much. I mean, I could see why discovery orders or other scheduling matters or things like that would be an expansion. I guess I'm still a little stuck on how it could be an expansion in light of Shoup as to what was in issue in Shoup. Well, and to address that, this is not also a final determination. And I think what's evident here is the district court is planning to move quickly. It's scheduled a bail hearing for May 9th and a Habeas hearing for May 22nd. It requires a response to its presence in the district for the duration of those proceedings, which will be over quickly. So it is at most a temporary transfer order. Now, if it orders her release because she is unlawfully detained, then the government has no argument that it has discretion to detain her at a location of its choice. So if she were to remain in detention, she could be transferred back to Louisiana following the Habeas proceedings? Following the completion of the Habeas proceedings because the ultimate relief she's seeking is not a particular location of transfer. So again, that's why this order is very different from cases where collateral order doctrine has been found to apply and really would represent an expansion because the arguments the government is making are about operational and logistical issues, which, again, apply any time the government or any litigant has to produce people, witnesses, documents, anything to enable a court to exercise its jurisdiction. If I may turn to the question of the subject matter jurisdiction on the INA bars and respond to a few points. First, the Alvarez decision from the 11th Circuit was looking at 1252G with respect to final orders of removal, but it also predated the Supreme Court's decision in Jennings. And Jennings' framework makes very clear that the test is whether you would have meaningful review of your case through the petition for review process. Now, it doesn't matter that there might be some legal issues in common. That's not the test. If that were the test, Congress could have written that any legal issues relating to a removal proceeding are barred, but that's not what they wrote. Ms. Oster's claims do not arise from her removal proceedings. They arise from her detention, which is separate and needs to be justified separately by the  And most critically, her claim of unlawful detention arises from day one. And it was no answer in Jennings to say that simply because those claims of unlawful detention arose, say, at six months after a prolonged period, the government could not turn around and say, well, it doesn't matter because even at six months, the detention is still tied to the removal. The reason this person is in detention is because of the removal proceeding. No, the court said, for meaningful review of a detention claim at the date it became unlawful, you can bring a habeas claim. The government put some emphasis on the language in Jennings that does relate to detention in the portion of the opinion that was joined by two other justices. Three justices joined that portion of the opinion, which seems to be replaced with ellipses when it's re-quoted in the Regents' case in 2020, and I'm not quite sure what to make of that. How do you understand that language in Jennings? Do you mean the language that was distinguished in claims of the decision to put someone in detention?  I understand that to be the opinion of the plurality distinguishing what was not at issue there, but certainly— Is it the opinion of the plurality? I can't—I need a map and chart to figure it out, but as I see it, it's Justice Alito joined in part two by Justices Roberts and Kennedy. I think at most, that has to be understood as dicta because the court there was not considering a claim of detention that was unlawful at the outset. But the logic and the ultimate holding of Jennings was that if you don't have meaningful review of your claim, it is not barred by B-9. And the claim here is different than the one in Jennings, and I think it's more akin to what Judge Parker was mentioning, which is if someone says, I'm just being wrongfully detained. You got the wrong person, or my convictions under the statute don't meet the standard for detention under the statute. Where the claim of unlawful detention arises from day one, as it does here— Why do you think it arises here from day one? Why does it arise from day one? Because Ms. Ostrick's claim is that she has been detained in retaliation for writing an op-ed that was constitutionally protected speech in violation of the First Amendment. And so it isn't that she's been detained and that she is subject to removal proceedings. I mean, I find it difficult to untangle them or separate them in any way. Aren't they the same claims? And haven't removal proceedings been launched because of the op-ed and the decision to detain her made for the same reason? Are you alleged? Regardless of whether the government's motivation in both cases was the same, which is First Amendment retaliation, they are different claims. And her claim that her detention violates the First Amendment arises from her detention and not from her removal proceedings. The removal proceedings, if she is released from detention, if she is able to go back to school and continue to finish her PhD, the removal proceedings can continue. And whatever claims she has to oppose the removal proceedings can be raised in that process. But the detention claim, her argument is that separately she has been detained in retaliation for her speech and that that is the motivating reason. And so that is, you know, to the extent that the government disputes the merits of that, which it seems as if they're trying to suggest there can never be a claim of unlawful retaliation, but that's a claim that she has raised and is entitled to have heard. When she got the notice to appear at the same time she was detained, why doesn't that mark the start of removal proceedings that are subject to some of the jurisdiction stripping provisions that the government cites? Well, first of all... Why is it arising from removal proceedings? No, Your Honor, because first of all, you know, there's evidence in the record and this will be presented before the district court as well, that detention is not the norm with respect to visa replication as we had here. That the executive branch made a specific decision to detain this officer that was motivated by her speech. But my question really doesn't have to do with the norm. I mean, there is detention provided for by various statutory provisions, but to the extent that there's jurisdiction is stripped of the district court for habeas, when in connection with removal proceedings, why doesn't this detention in service of the notice to appear mark the start of those removal proceedings? Um, I think the start of the removal proceedings are just with the notice to appear. And one thing that's of note here is that her visa replication was silent. So that she was apprehended and detained first. And then the notice to appear was served. And the detention is not a necessary part of starting removal proceedings. A notice to appear can be issued at any time, separate and apart from any decision to detain. And so, again, her claim here, and 1252G, you know, is limited to those three distinct processes. And then with B-9, I think, again, the argument that you're suggesting was rejected by the majority, not necessarily, because the argument there would be, even in prolonged detention, you know, why isn't that detention part and parcel of the removal proceedings? But they're not. They're not intertwined. And the Supreme Court has instructed us to read those three parts of the proceeding, the removal, the proceedings, the adjudication, and the execution, I guess, of the removal order very narrowly to avoid some of the absurdities that would result within the immigration statutes, to read them more broadly. I think Justice Alito, Justice Scalia directed that initially. And that's been re-upped recently by this court. Yes. And I think the Third Circuit, following Jennings and the EOHC case, took the right approach with this, where they looked at whether your claim was a now or never claim. And they also looked at the nature of the relief you are seeking, which this court in Delgado also said. You look at the substance of the relief. The substance of the relief that Ms. Ostrick is seeking is to be released from detention. And that is why, fundamentally, it is not barred. Can I ask you on the custodian? The government, I don't think this was in the papers, but articulated here that the proper custodian, at the time the petition was filed, would have been the warden at the detention center where Ms. Ostrick was being brought to. I don't think that was in the papers, so I don't know what your response to that argument is. Our response to that is, that isn't a straightforward application of pitea. That is a rule that the government is creating without support. Ms. Ostrick was in transit when she filed her habeas petition at 10.02 p.m. The government has never identified any other immediate custodian. It was not the warden at the destination, nor could it have been, because that warden could not have produced her to the court. The government has made reference multiple times to the fact that it was a short gap. It was a short gap until she reached the warden in Vermont. It was only 12 hours until she was in Louisiana. Of course, that amounts to the breathtaking position that the executive can unilaterally suspend the writ of habeas corpus on its own. Of course, even a 12-hour period would be sufficient to, say, remove someone from the United States before any court could have reached out to a cert jurisdiction whatsoever. So, no, I think the district court here got the order of operations correct. You start with the transfer statute, which said that once the petition was filed, she was in Vermont. It could have been brought in Vermont at the time it was filed, and 1631 is very explicit that it operates as a time machine, as if it was filed at the time. Then the rule of endo kicks in, and you cannot move the body to defeat the jurisdiction of the court. And so, you know, if there's any concern about whether her immediate custodian was named, one, the government has never identified anyone other than Rosalinda Hyde. But even if it did, the unknown custodian rule, as recognized in Padilla, notes that that does not defeat jurisdiction. And then finally, and third, you could always amend under Rule 15 to include the immediate custodian, and that would, you know, cure that problem. The ordinary rules of amendment would apply. Again, the government takes a breathtaking position that if you file a petition for habeas corpus, and you don't know the custodian because of the government's own decision not to provide that information to you, that they can essentially suspend the writ for as long as they choose, and until they decide that they can let you know who the custodian is. All right. Thank you, counsel.